IN TH UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| FAST MEMORY ERASE, LLC | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| VS. | § | NO. 3-10-CV-0481-M-BD |
| | § | |
| SPANSION, INC., ET AL. | § | |
| | § | |
| Defendants. | § | |

## FINDINGS AND RECOMMENDATION OF THE
## UNITED STATES MAGISTRATE JUDGE

Defendants Intel Corporation, Numonyx B.V., and Numonyx, Inc. ("the Intel Defendants")
have filed a motion for $1,677,455.50 in attorney's fees as the prevailing parties in this patent
infringement action. The Intel Defendants also seek court costs totaling $1,117,625.14. Of that
amount, plaintiff objects to $1,099,195.22. For the reasons stated herein, the Intel Defendants'
motion for attorney's fees should be denied, and plaintiff's objections to the bill of costs should be
sustained in part and overruled in part.

I.

The relevant background facts and a detailed summary of the underlying technology are set
out in *Fast Memory Erase, LLC v. Spansion, Inc.*, Nos. 3-08-CV-0977-M & 3-09-CV-0653-M, 2010
WL 363498 at *5 (N.D. Tex. Feb. 2, 2010). Succinctly stated, plaintiff is the owner of two patents
that teach a method for erasing memory cells in semiconductor devices. One of the patents, U.S.
Patent No. 6,303,959 ("the '959 Patent"), is directed toward reducing source leakage, which occurs

during the erasure process. Plaintiff contends that the '959 Patent is not limited to a particular type of semiconductor device, but is most effective in erasing nonvolatile flash memory devices.[1]

On June 9, 2008, plaintiff sued the Intel Defendants and other manufacturers of consumer electronic products containing NOR flash memory chips for infringement of the '959 Patent.[2] Claim 1 of the patent reads:

> A semiconductor device comprising:
>
> a stacked gate provided on a portion of a semiconductor substrate;
>
> a first oxide layer provided on the edge of the stacked gate;
>
> a spacer provided adjacent the first oxide layer; and
>
> a doped source region, the source region having a first doped region disposed under the edge of the stacked gate and a second doped region disposed at the edge of the doped source region under the stacked gate;
>
> wherein the second doped region has a higher concentration of dopant than the first doped region, whereby source leakage of the semiconductor device is reduced.

See '959 Patent, Cl. 1. There are four general methods for the erasure of flash memory: source erase, channel erase, gate erase, and drain erase. A key issue decided by the court on claim construction was whether "source leakage" occurs only during source erase, or whether there is also "source leakage" during other erasure procedures. The court construed the term "source leakage" to mean

---

[1] Flash memory is a technology used in memory cards and USB drives for the storage and transfer of data between computers and other digital products. Flash memory is also widely used in mobile phones, laptops, digital audio players, and digital cameras. Since flash memory is nonvolatile, no power is needed to maintain the information stored on the memory chip. Flash memory can be electronically programmed and erased, making it useful in products in which files are frequently deleted or changed. See Fast Memory Erase, 2010 WL 363498 at *1.

[2] Plaintiff also sued for infringement of U.S. Patent No. 6,236,608 ("the '608 Patent"). On December 9, 2009, the court stayed all proceedings relating to the '608 Patent pending reexamination by the U.S. Patent and Trademark Office.

leakage that occurs during source erase. *See Fast Memory Erase*, 2010 WL 363498 at *5. Based on this claim construction, the parties stipulated to the entry of a final judgment of non-infringement.

The Intel Defendants now seek $1,677,455.50 in attorney's fees and $1,117,625.14 in court costs as the prevailing parties in this case. Plaintiff opposes any award of attorney's fees and all but $23,085.76 in court costs. The issues have been fully briefed by the parties and this matter is ripe for determination.[3]

## II.

The $1,677,455.50 in attorney's fees sought by the Intel Defendants represent more than 4,200 hours of work performed by 22 different lawyers and two paralegals at billing rates ranging from $753.48 to $82.54 per hour. (*See* Def. Mot. App., Exh. 4A at 135). Recognizing that attorney's fees are recoverable only in "exceptional cases," the Intel Defendants accuse plaintiff of bringing a baseless action in bad faith without any evidence of infringement.

### A.

Section 285 of the Patent Act authorizes the court to award reasonable attorney's fees to a prevailing party in an "exceptional case." 35 U.S.C. § 285; *see also Amsted Industries, Inc. v. Buckeye Steel Castings Co.*, 23 F.3d 374, 376 (Fed. Cir. 1994). Under Federal Circuit precedent, which governs the award of attorney's fees in patent cases, a prevailing party must prove by clear and convincing evidence that a case is "exceptional." *See Perricone v. Medicis Pharmaceutical Corp.*, 432 F.3d 1368, 1380 (Fed. Cir. 2005). "Exceptional cases usually feature some material,

---

[3] Plaintiff has also filed a motion to strike the Intel Defendants' reply brief or, alternatively, for leave to file a surreply on this issue of attorney's fees. Because the court has determined that this is not an "exceptional case" justifying an award of attorney's fees, plaintiff's motion [Doc. #62] is denied as moot. *See Wayne v. Dallas Morning News*, 78 F.Supp.2d 571, 588 (N.D. Tex. 1999) (denying as moot a motion to strike where court would have reached the same result even if it considered the challenged evidence).

inappropriate conduct related to the matter in litigation, such as willful infringement, fraud or inequitable conduct in procuring the patent, misconduct during litigation, vexatious or unjustified litigation, conduct that violates Federal Rule of Civil Procedure 11, or like infractions." *Serio-US Indus., Inc. v. Plastic Recovery Tech. Corp.*, 459 F.3d 1311, 1321-22 (Fed. Cir. 2006). "Absent misconduct in the litigation or in securing the patent, a trial court may only sanction the patentee if both the litigation is brought in subjective bad faith and the litigation is objectively baseless." *Id.* at 1322; *see also FieldTurf Int'l, Inc. v. Sprinturf, Inc.*, 433 F.3d 1366, 1373 (Fed. Cir. 2006), *quoting Forest Labs., Inc. v. Abbott Labs.*, 339 F.3d 1324, 1329 (Fed. Cir. 2003), *cert. denied*, 124 S.Ct. 1076 (2004) (award of attorney's fees under section 285 is "limited to circumstances in which it is necessary to prevent a 'gross injustice'").

## B.

The Intel Defendants contend that this case is "exceptional" because plaintiff pursued its claims in bad faith knowing it could not prove infringement. According to the Intel Defendants, a key limitation of claim 1 of the '959 Patent requires that accused products have a specific, unusual doping profile of the source region of a flash memory cell, "wherein the second doped region has a higher concentration of dopant than the first doped region[.]" *See* '959 Patent, Cl. 1.[4] To prove that the accused products have the required doping profile, the Intel Defendants maintain that plaintiff "had to rely on testing or simulations because dopant concentrations in the microscopic dimensions of a flash memory cell cannot be observed by the naked eye." (Def. Mot. Br. at 1). Plaintiff never

---

[4] Although asked to do so by the Intel Defendants, the court expressly declined to construe this phrase on claim construction. Instead, the court held that "this phrase plainly involves a comparison in concentrations of dopant, not dopant types. The plain and ordinary language of the claim controls." *Fast Memory Erase*, 2010 WL 363498 at *8.

disclosed the results of any tests showing that Intel products satisfied this limitation. (*See id.* at 13-14). The Intel Defendants also accuse plaintiff of mischaracterizing simulation graphs, which "unambiguously show conventional, non-infringing doping profiles," in order to justify a meritless infringement opinion by its expert, Dr. David Liu. (*Id.* at 2). Instead of locating the "second doped region" at the edge of the source, as required by claim 1, the Intel Defendants allege that Dr. Liu "disingenuously placed the 'second doped region' in the middle of the source -- so that he could misleadingly state that the second doped region has a higher concentration than the first doped region and thus conclude that the accused products have the Required Doping Profile." (*Id.*). As a result of plaintiff's misconduct, the Intel Defendants believe that attorney's fees are warranted under section 285.

The court initially observes that "there is a presumption that an assertion of infringement of a duly granted patent is made in good faith." *Medtronic Navigation, Inc. v. BrainLAB Medizinische Computersysteme GmbH*, 603 F.3d 943, 954 (Fed. Cir. 2010); *see also Brooks Furniture Mfg., Inc. v. Dutailier Int'l, Inc.*, 393 F.3d 1378, 1382 (Fed. Cir. 2005); *Springs Window Fashions LP v. Novo Indus., L.P.*, 323 F.3d 989, 999 (Fed. Cir. 2003). That a patentee cannot prove infringement does not automatically mean that the suit was objectively baseless or brought in bad faith. *See, e.g. Aspex Eyewear Inc. v. Clariti Eyewear, Inc.*, 605 F.3d 1305, 1315 (Fed. Cir. 2010); *Lighting World, Inc. v. Birchwood Lighting, Inc.*, 382 F.3d 1354, 1367 (Fed. Cir. 2004); *Forest Labs.*, 339 F.3d at 1329-30. Nor will the court infer bad faith as a result of plaintiff's refusal to disclose the results of its pre-suit investigation, including reverse-engineering reports analyzing the accused devices. The court previously determined that the reports prepared by Semiconductor Insights, Inc., a non-

testifying consulting expert, were exempt from discovery under Rule 26(b)(4)(B).[5] *See Fast Memory Erase, LLC v. Spansion, Inc.*, No. 3-08-CV-0977-M, 2009 WL 4884091 at*2 (N.D. Tex. Dec. 16, 2009). Plaintiff should not be penalized for failing to disclose those materials.

More importantly, the ultimate issue of infringement was never determined by or litigated before the district court. Instead, plaintiff stipulated to a judgment of non-infringement based solely on the court's determination that the term "source leakage," as used in the '959 Patent, is limited to source erase procedures. (*See* Doc. #4 at 2). Plaintiff made no concession regarding the "doping profile" of any of the accused products. Nor did plaintiff concede that it could not prove infringement on the grounds now advanced by the Intel Defendants. To the contrary, plaintiff disputes the characterization of the doping profile made by the Intel Defendants and their assertion that the accused products do not satisfy the requirement. (*See* Plf. Resp. Br. at 6-18). It would be inappropriate for the court to decide the ultimate issue of infringement on less than a full record in the context of a motion for attorney's fees. Without an underlying finding of non-infringement, the Intel Defendants cannot prove by clear and convincing evidence that this action is baseless, much less brought in bad faith. Accordingly, their motion for attorney's fees should be denied.

---

[5] Rule 26(b)(4)(B) provides, in pertinent part, that:

> [A] party may not, by interrogatories or deposition, discover facts known or opinions held by an expert who has been retained or specially employed by another party in anticipation of litigation or to prepare for trial and who is not expected to be called as a witness at trial. But a party may do so only:
>
> * * * *
>
> (ii) on showing exceptional circumstances under which it is impracticable for the party to obtain facts or opinions on the same subject by other means.

FED. R. CIV. P. 26(b)(4)(B).

III.

The Intel Defendants also seek $1,117,625.14 in costs.[6] Plaintiff objects to: (1) $1,058,170.90 paid to an outside vendor for collecting, processing, and producing electronic documents; (2) $38,028.11 for the production of a *Markman* tutorial; and (3) $2,996.21 for certified copies of deposition transcripts. (*See* Doc. #57 at 2-4, 29).

A.

A prevailing party in a civil action is entitled to recover its costs unless a federal statute, the federal rules, or the court provides otherwise. *See* Fed. R. Civ. P. 54(d)(1). Taxable court costs include: (1) fees paid to the clerk and the marshal; (2) court reporter fees for all or part of a deposition transcript; (3) witness fees and related expenses; (4) printing costs; and (5) fees for copies of papers necessarily obtained for use in the case. *See* 28 U.S.C. §§ 1821 & 1920. In patent cases, regional circuit law governs the taxation of costs and related issues. *See Ortho-McNeil Pharm., Inc. v. Mylan Labs. Inc.*, 569 F.3d 1353, 1356 (Fed. Cir. 2009). Under Fifth Circuit precedent, a district court may decline to award statutory costs, but may not award costs outside those categories. *See Crawford Fitting Co. v. J.T. Gibbons, Inc.*, 482 U.S. 437, 441-42, 107 S.Ct. 2494, 2497, 96 L.Ed.2d 385 (1987). Absent a timely objection, costs taxed by the clerk are presumed necessary to the case. *See Rundus v. City of Dallas*, No. 3-06-CV-1823-BD, 2009 WL 3614519 at *1 (N.D. Tex. Nov. 2, 2009), *citing Kellogg Brown & Root International, Inc. v. Altanmia Commercial Marketing Co., W.W.L.*, No. H-07-2684, 2009 WL 1457632 at *3 (S.D. Tex. May 26, 2009). However, if a party

---

[6] The Intel Defendants submitted a bill of costs for $1,211,726.06, and the clerk taxed costs in that amount. (*See* Doc. #25). After further discussions between the attorneys, the Intel Defendants agreed to certain reductions in the amounts claimed for deposition transcripts, interpreter fees, and the cost of producing their *Markman* tutorial, resulting in costs totaling $1,117,625.14. (*See* Doc. #57 at 60). Of that amount, plaintiff does not object to $200.00 in fees paid to the clerk, $1,306.19 for witness fees, $4,655.84 for interpreter fees, $11,240.16 for copy charges, and $5,683.57 for deposition transcripts. (*See id.* at 1-2).

timely objects to the clerk's action, the party seeking costs has the burden of supporting its request with evidence documenting the costs incurred and, if applicable, the necessity of such costs. *See id.*

## B.

The vast majority of the disputed costs are for services provided by iDiscover Global Inc. ("iDiscover"), an e-discovery vendor. These costs fall into two broad categories: (1) $860,533.18 for collecting and processing more than 2,100 gigabytes of electronically stored information, or ESI; and (2) $197,637.72 for creating TIFF/OCR images of documents responsive to plaintiff's discovery requests. (*See* Doc. #57 at 10-11, 14). In his supplemental declaration, Jake Brown, Vice President of Sales for iDiscover,[7] explains the nature of the work performed by his firm in collecting and processing ESI:

> In connection with FME's document requests, iDiscover performed a number of steps that were an indispensable part of the process of producing electronic documents to FME on behalf of Intel and Numonyx. First, iDiscover had to make a forensically accurate copy of the electronic documents that were maintained by Numonyx employees on laptops or desktops, as well as electronic documents Numonyx maintained on shared network storage devices. A forensically accurate copy is one that does not alter the text of the document or the metadata accompanying the document. Metadata is information about the document itself, such as the person who created the document or the date the document was last modified.

\* \* \* \*

---

[7] Plaintiff objects to any evidence submitted by the Intel Defendants, including the Brown supplemental declaration, after the clerk taxed costs on April 20, 2010. (*See* Doc. #57 at 9). This objection borders on frivolous. At plaintiff's request, the court extended until May 3, 2010 the deadline for filing a motion in opposition to the bill of costs. (*See* Doc. #27). As part of that order, the parties were instructed to file a joint status report detailing their efforts to resolve this dispute, accompanied by any supporting evidence and affidavits. (*See id.* at 2). In lieu of considering numerous motions for leave to supplement or correct previous filings, the court ordered the parties to submit a revised joint status report and an appendix of evidence by May 21, 2010. (*See* Doc. #54 at 2). Brown's supplemental declaration is included in an appendix to the revised joint status report filed on that date. Thus, all the evidence relied on by the Intel Defendants, including the Brown supplemental declaration, is properly before the court.

After the forensic copies were made, the collected data had to be processed through various automated steps to prepare it for production. These steps involved (1) extracting the text and metadata of the electronic documents, (2) indexing the text and metadata, (3) removing identical copies of documents, and (4) running search terms on the data to provide a subset of data that received search hits. None of these steps was performed by attorneys or humans. These are automated technical processing steps performed by software, with an iDiscover employee checking errors after each automated step. Each of these steps is part of the "Searching/Filtering" and "Native File Review" tasks referenced on the iDiscover invoices. The Native File Review also included the additional steps of (i) exporting the data that received search hits, along with the families of that data (*e.g.*, an email and its attachments), to an online hosting review tool for attorney review, and (ii) assigning control numbers to the exported documents.

(*See* Doc. # 58 at 33-34, ¶¶ 3-4). Regarding the creation of TIFF/OCR images of documents, Brown states:

After electronic documents were selected for production, iDiscover put the responsive documents in a format known as "TIFF" (Tagged Image File Format). For each responsive document we also created a corresponding optical character recognition ("OCR") file that made the document text searchable. I understand that FME requested that Intel and Numonyx produce documents in TIFF/OCR format so that they could be searched by text. iDiscover was also involved in taking paper documents collected from Intel and Numonyx and making TIFF/OCR images for production to FME's counsel. The TIFF/OCR images were endorsed with production numbers and confidentiality designations.

(*Id.* at 34, ¶ 5). The Intel Defendants argue that these costs represent "fees for exemplification and the costs of making copies of any materials where the copies are necessarily obtained for use in the case," which are taxable under 28 U.S.C. § 1920(4). Plaintiff counters that the expenses are not recoverable as statutory costs.

1.

Recent decisions accounting for technological advances in document storage and retrieval have recognized that electronic scanning and imaging of paper documents is the modern-day equivalent of "exemplification and copies" of paper. *See, e.g. Rundus*, 2009 WL 3614519 at *3 (citing cases). Thus, courts have allowed a prevailing party to recover the costs of converting paper documents into electronic files where the parties agreed that responsive documents would be produced in an electronic format. *Id.*; *see also Neutrino Development Corp. v. Sonosite, Inc.*, No. H-01-2484, 2007 WL 998636 at *4 (S.D. Tex. Mar. 30, 2007) (where electronic data was produced by agreement, in lieu of paper copies, the cost of production was recoverable under section 1920). Here, it is undisputed that the Intel Defendants produced TIFF/OCR images to plaintiff in response to written discovery requests. (*See* Doc. #57 at 44). Indeed, plaintiff's request for production requires that "[c]ertain documents, including Microsoft Word documents and email, . . . be produced in searchable tiff format." (*See* Doc. #58 at 5). Counsel for plaintiff also stated his preference that the Intel Defendants produce documents as "individual tiffs with OCR text." (*See* Doc. #10 at 42). Under these circumstances, the Intel Defendants are entitled to recover $197,637.72 in costs for creating TIFF/OCR images of documents responsive to plaintiff's discovery requests. *See Rundus*, 2009 WL 3614519 at *3 (where counsel agreed during discovery that responsive documents would be produced in electronic format, prevailing party was entitled to recover the cost of producing one set of electronic documents).

The court reaches a different conclusion with respect to $860,533.18 in costs for collecting and processing ESI.[8] Although the Fifth Circuit has not yet addressed the issue, a majority of district courts have held that costs for data extraction and storage are not recoverable under section 1920(4). *See, e.g. Kellogg*, 2009 WL 1457632 at *5; *Fells v. Virginia Dept. of Transportation*, 605 F.Supp.2d 740, 743 (E.D. Va. 2009); *Klayman v. Freedom's Watch, Inc.*, No. 07-22433-CIV, 2008 WL 5111293 at *2 (S.D. Fla. Dec. 4, 2008); *Windy City Innovations, LLC v. America Online, Inc.*, No. 04-C-4240, 2006 WL 2224057 at *3 (N.D. Ill. Jul. 31, 2006). *But see CBT Flint Partners, LLC v. Return Path, Inc.*, 676 F.Supp.2d 1376, 1381 (N.D. Ga. 2009) (allowing recovery of all costs for services provided by e-discovery consultant in processing electronic documents for production). As the court noted in *Kellogg;*

> The steps that KBR had the third-party vendor perform do not appear to be electronic equivalents of exemplification and copying. Rather, these steps appear to be the processing of tapes to locate, retrieve, and store information that might be responsive to a production request. The steps of extracting data from an electronic medium and storing that data for possible use in discovery is more like the work of an attorney or legal assistant in locating and segregating documents that may be responsive to discovery than it is like copying those documents for use in a case. The extraction and storage did not involve certification of public documents or the preparation of demonstrative exhibits. Nor does KBR assert that the extraction and storage involved electronically scanning information to be produced in electronic form.

*Kellogg*, 2009 WL 1457632 at *5. In view of the weight of authority declining to tax costs for data extraction and storage, the court should sustain plaintiff's objection to $860,533.18 in costs for

---

[8] This sum represents: (1) $32,248.75 for making "forensically accurate copies" of electronic documents; (2) $683,209.67 for conducting a "native file review;" and (3) $145,074.76 for performing a "search/filtering" analysis. (*See* Doc. #57 at 41-42).

collecting and processing ESI. *See also Allen v. U.S. Steel Corp.*, 665 F.2d 689, 697 n.5 (5th Cir. 1982) ("[F]ees for 'copies of papers' permitted under §1920(4) allows recovery only for the reasonable costs of actually duplicating documents, not for the cost of gathering those documents as a prelude to duplication.").

## C.

Plaintiff also objects to $38,028.11 in costs for the production of a computer-animated *Markman* tutorial explaining the technical aspects of '959 Patent. In the Fifth Circuit, expenses for the production of various types of non-testimonial evidence -- such as photographs, maps, charts, graphs, and other demonstrative aids -- are taxable as costs provided the prevailing party obtained court approval before incurring the expense. *See Louisiana Power & Light Co. v. Kellstrom,* 50 F.3d 319, 335 (5th Cir.), *cert. denied,* 116 S.Ct. 173 (1995); *Studiengesellschaft Kohle mbH v. Eastman Kodak Co.*, 713 F.2d 128, 133 (5th Cir. 1983). Plaintiff does not dispute that the district court invited the submission of tutorials in connection with the *Markman* hearing. Nor does plaintiff contend that the tutorials were not considered or relied upon by the court in ruling on the claim construction issues. Instead, plaintiff argues that the cost of producing a "fully-animated, professionally scripted presentation complete with voice-overs performed by Hollywood actors" should be disallowed because the tutorial went beyond what was necessary to explain the relevant technology. (*See* Doc. #57 at 25).

The court disagrees. Recognizing that the case involved complicated technical matters, the district court invited both parties to submit tutorials in advance of the *Markman* hearing. *See Fast Memory Erase, LLC v. Spansion, Inc.*, No. 3-08-CV-0977-M (Doc. #169 at 4). Such an invitation is tantamount to pretrial approval. *See J.T. Gibbons Inc. v. Crawford Fitting Co.*, 760 F.2d

-12-

613, 615 (5th Cir. 1985) (specific request by court for audio-visual equipment was tantamount to pretrial authorization). The court carefully considered the tutorials submitted by both parties and found them helpful in understanding the technology at issue. (*See* Doc. #58 at 28-29). Other than generally alleging that the tutorial prepared by an outside vendor for the Intel Defendants was "extravagant," ostensibly because of its use of computer animation and other advanced production features, plaintiff offers nothing to enable the court to reach such a conclusion. Plaintiff's objection to these costs should be overruled. *See Competitive Tech. v. Fujitsu Ltd.*, No. C-02-1673-JCS, 2006 WL 6338914 at *9 (N.D. Cal. Aug. 23, 2006) (costs of preparing visual aids for technology tutorial and *Markman* hearing are recoverable if reasonably necessary to assist the court in understanding the issues).

### D.

Finally, plaintiff objects to $2,996.21 for certified copies of eight depositions. (*See* Doc. #57 at 27-29). A prevailing party is entitled to recover costs for taking, transcribing, and reproducing depositions that are "necessarily obtained for use in the case." 28 U.S.C. § 1920(2); *see also Coats v. Penrod Drilling Corp.*, 5 F.3d 877, 891 (5th Cir. 1993), *cert. denied*, 114 S.Ct. 1303 (1994). However, charges for multiple or certified copies of depositions are not taxable as costs absent some showing of why the extra copies were needed in addition to the originals. *Studiengesellschaft Kohle*, 713 F.2d at 134; *Waggoner v. TransUnion, LLC*, No. 3-02-CV-1494-G, 2003 WL 22838718 at *4 (N.D. Tex. Nov. 24, 2003). Here, the Intel Defendants have failed to demonstrate why they needed certified copies in addition to originals of the deposition transcripts. The evidence shows only that U.S. Legal Support, the firm that transcribed the depositions, does not permit its customers to order an original deposition without a corresponding certified copy. (*See* Doc. #58 at 235-36). However,

no reason is given for why certified copies were necessary, other than for the convenience of counsel. Plaintiff's objection to these costs should be sustained. *See Maurice Mitchell Innovations, L.P. v. Intel Corp.*, 491 F.Supp.2d 684, 689 (E.D. Tex. 2007) (disallowing cost of certified copies of deposition transcripts absent showing that certified copies were necessary).

## **RECOMMENDATION**

The Intel Defendants' motion for attorney's fees [Doc. #19] should be denied.

Plaintiff's objections to the bill of costs [Doc. #34] should be sustained in part and overruled in part. The objections should be sustained with respect to $860,533.18 in costs for collecting and processing ESI, and $2,996.21 in costs for certified copies of deposition transcripts. In all other respects, the objections should be overruled. The clerk should be instructed to tax costs in the amount of $247,511.43 against plaintiff and in favor of the Intel Defendants.

A copy of this report and recommendation shall be served on all parties in the manner provided by law. Any party who objects to any part of this report and recommendation must file specific written objections within 14 days after being served with a copy. *See* 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 72(b). In order to be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the magistrate judge's report and recommendation where the disputed determination is found. An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific. Failure to file specific written objections will bar the aggrieved party from appealing the factual findings and legal conclusions of the magistrate judge that are accepted or adopted by the district court, except upon grounds of plain error. *See Douglass v. United Services Automobile Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996).

DATED:  November 10, 2010.

JEFF KAPLAN
UNITED STATES MAGISTRATE JUDGE